# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

| | |
|---|---|
| INFORMATION ASSOCIATED WITH FACEBOOK USER ID # 504112393 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 16-M-1314 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
- ■ evidence of a crime;
- ■ contraband, fruits of crime, or other items illegally possessed;
- ■ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Andrew Krzeptowski, ATF
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: 9/21/16

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin      Honorable William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID # 504112393 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. _____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Andrew Krzeptowski, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. I am employed with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since September of 2014. I attended the Federal Law Enforcement Training Center where I completed both the Criminal Investigator Training Program and the ATF Special Agent Basic Training program. My duties as a Special Agent with ATF include investigating alleged violations of the federal firearms, arson, and explosives laws under the purview of the Gun Control Act (as amended) under Title 18 of the United States

Code. During the course of my career, I have had in-service trainings regarding the use of social media in relation to criminal investigations. Specifically, I have received instruction regarding the use of social media sites by criminal elements. Additionally, I have conducted previous criminal investigations in which internet research that I conducted yielded the use of social media by suspects. Specifically, I know from my training and experience that alleged suspects of criminal activity, who have accounts on social media websites, will often communicate their criminal intentions or past activity via "instant message" or "in-box message" on a given social media website. The "instant message" / "in-box message" is a private communication from one user to another. Furthermore, I know through experience that many social media users often use social media websites as their primary means to communicate with others. Additionally, I know from training and experience that suspects who use social media websites sometimes post photographs of themselves possessing incriminating items, such as narcotics and firearms. Also, suspects in criminal investigations have been known to post statements on social websites referencing their own criminal activity.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Van L. Mayes has in his possession evidence of crimes committed in violations of Title 18 U.S.C. 844(i) (Arson of Property in Interstate Commerce), 18 U.S.C 924(c) (use of a Molotov Cocktail to commit a federal arson crime), and 26 U.S.C. 5861(d), (e) & (f), (possess, transfer or making a firearm not registered in the National Firearms

2

Registration and Transfer Record). There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

*CASE BACKGROUND*

5. On August 13, 2016, at about 8:45PM, several unknown subjects maliciously set fire to a Milwaukee Police Department unmarked squad car (2005 Chevy Impala black 4 door bearing WI auto plate #740-JYE, VIN #2G1WF55K059378485) at 3205 North Sherman Blvd. in the city and county of Milwaukee, WI. This act caused over $10,000 dollars in loss and damage.

6. On August 13, 2016, at about 9:40PM, several unknown subjects were involved in property damage, burglary, and malicious use of fire at the BP Gas Station located at 3114 North Sherman Blvd. in the city and county of Milwaukee, WI. This act caused over $1,000,000 in damage.

7. Based upon publicly available information, affiant is aware that Van L. Mayes, B/M, 03-01-1987 (Mayes), was at the scene of the aforementioned squad car fire and BP Gas Station Fire on August 13, 2016.

8. Affiant is aware that Mayes maintains an Instagram application "YungLz" and a Facebook page "Vaun L Mayes" on social media. Mayes' Facebook account and Instagram application have content in the form of text, photographs, and video footage that he regularly provides to his social media audience.

9. Affiant knows that Mayes has a Facebook account profile "Vaun L Mayes" with a Facebook ID # 504112393. This Facebook account contains photographs and videos of Mayes, and the identification of Mayes has been verified through a comparison by law enforcement to Milwaukee Police Department booking photo of Van L. Mayes, B/M, 03-01-1987.

10. Law enforcement viewed the "Vaun L Mayes" Facebook account, which showed a 48-second video from August 13, 2016. Mayes was speaking in the video. Law enforcement was able to verify that Mayes was the person speaking in the video and taking the video because he films himself during the video. The video depicts subjects, on August 13, 2016, damaging Milwaukee Police Department squad (2005 Chevy Impala black 4 door bearing WI auto plate #740-JYE, VIN #2G1WF55K059378485). The subjects are seen damaging the squad car with chunks of concrete and then setting it on fire with what is believed to be a road flare from the trunk of the squad car. Mayes is heard encouraging the subjects. Mayes appears to be within 1 foot of the squad car, and he captured some images of the actors involved. This video was posted on August 13, 2016 at about 9:20PM. After law enforcement viewed the video, it was removed from Mayes' Facebook account.

11. Affiant knows Mayes posted another video to his Facebook account in which the squad car is on fire and someone has placed a suspected road flare into the squad car's gas reservoir. This video was posted on August 16, 2016, at about 4:12AM. After law enforcement viewed the video, it was removed from Mayes' Facebook account.

12. Also on Mayes' Facebook account, affiant observed a video that is edited using several different video clips from what appears to be multiple videos from the squad car and BP gas station incidents on August 13, 2016. Affiant believes that this reveals that Mayes is using computer editing technology to make these videos, not likely a cellphone, and likely has additional videos of the arson events from August 13, 2016, that he did not release on social media.

13. Affiant knows that on a Facebook profile "Vaun L Mayes" with a Facebook ID # 504112393 is connected to Instagram application "YungLz". "YungLz" contains photographs

4

and videos of Mayes and the identification of Mayes has been verified through a comparison by law enforcement to Milwaukee Police Department a booking record photo of Van L. Mayes, B/M, 03-01-1987.

14. A video from "YungLz" application posted a 49 second video from August 13, 2016, at 11:39PM. The video has audio as well as video in which Mayes is heard narrating the actions occurring. The video shows several unknown subjects intentionally and without consent entering the BP Gas Station located at 3114 North Sherman Blvd., Milwaukee, minutes before it is set on fire.

15. On August 23, 2016, ATF was contacted regarding suspected Improvised Incendiary Devices (IID) located within a dumpster at 3284 N. Sherman Boulevard, Milwaukee, Wisconsin. ATF Special Agents traveled to the above location and discovered a brown box containing ten glass bottles containing a liquid with a cloth rag inserted into the opening. The responding agents also smelled a strong odor of a petroleum distillate emanating from the dumpster, which is consistent with the presence of gasoline. From training and experience, the agents identified these devices as Molotov Cocktails. Some of the glass bottles holding the liquid and cloth wick were labeled as Mike's Hard Lemonade, Everfresh juice, Mystic, and Seagrams Wine Coolers.

16. The apartment complex manager for the building located at 3284 N. Sherman Blvd., Milwaukee gave to law enforcement an apartment complex surveillance video from August 15, 2016.

17. Affiant is aware of the contents of those videos. The video shows, on August 15, 2016, an unknown person who is carrying a brown box by the dumpster next to the apartment

5

complex, which is consistent to where officers recovered a brown box containing multiple Molotov Cocktails on August 23, 2016.

18. The above-referenced apartment complex video show that an unknown person walked in the area by Charles N. Edwards' apartment, which is unit #2. Through the apartment manager at 3284 N. Sherman Blvd., Milwaukee, affiant received information that the apartment manager has personal knowledge that a tenant, Charles N. Edwards, had personal video surveillance devices that may have captured activity on the outside of his apartment unit.

19. On August 23, 2016, and while still on location at 3284 N. Sherman Boulevard, Milwaukee, Wisconsin, ATF Special Agents observed a nozzle for a gas can under the porch of 3284 N. Sherman Boulevard, Apartment 2, Milwaukee, WI. Agents spoke with the resident of this unit who was ultimately identified as Charles N. Edwards of 3284 N. Sherman Boulevard, Apartment 2, Milwaukee, WI. Edwards explained to agents that this nozzle was part of a gas can he had for a generator.

20. On August 26th, 2016, a juvenile Source of Information (SOI) was interviewed by ATF Special Agents regarding the fires started during on August 13 and 14, 2016. The SOI stated that he observed a subject light and throw a Molotov Cocktail into the BP Gas Station located at 3114 N. Sherman Boulevard, Milwaukee. SOI also saw that same subject pour flammable liquids onto the vehicles located at the BP Gas Station. SOI stated that this subject was then joined by two additional males who threw Molotov cocktails into the gas station.

21. On August 29, 2016, law enforcement conducted a search warrant at the residence of Van L. Mayes located at 2746 A, at North 49th Street, Milwaukee, Wisconsin. Law enforcement observed a full bottle of a Seagram's Wine Cooler and one empty bottle of Everfresh juice. These bottle types were consistent with the bottle types used in the construction

6

of the Molotov cocktails recovered by law enforcement on August 23, 2016, from the dumpster of 3284 N. Sherman Boulevard, Milwaukee, Wisconsin. During the search warrant, Mayes related to law enforcement that two gasoline cans and empty bottles from his house were transported to a man named Charles who used a wheelchair and resided off of Sherman Boulevard. Mayes also stated that he left the two cans of gasoline at Charles' residence.

22. Affiant verified that Charles N. Edwards is currently in a wheelchair.

23. On August 29, 2016 Charles N. Edwards was arrested for felon in possession of a firearm. His step-daughter, Samantha Gamble stated during an interview with law enforcement officers, that she saw Van Mayes with her father when Charles Edwards was arrested.

24. On August 30, 2016, ATF Special Agents verified that Edwards resides at 3284 N. Sherman Boulevard Apartment #2, Milwaukee.

25. On August 30, 2016, Milwaukee County Court Judge Timothy Witkowiak signed a search warrant for Charles N. Edwards' residence located at 3284 N. Sherman Boulevard Apartment #2, Milwaukee, Wisconsin to search for evidence of narcotics and guns.

26. During the search of Charles N. Edwards' residence, the Milwaukee Police Department located gas cans inside of a bedroom; a gas can nozzle within the apartment's yard; and Everfresh juice, Seagrams Wine Cooler, and Mystic bottle caps within his trash receptacle on the outside of his apartment's porch.

27. An inquiry into the National Firearm Registration and Transfer Record revealed that Charles N. Edwards was not on record.

28. On September 9, 10, and 11, 2016 ATF Special Agents reviewed Van Mayes Facebook profiles. ATF Special Agents observed a video that Mayes had posted on August 13,

7

2016 where Mayes captured people looting and setting fire to the BP gas station at Sherman and Burleigh.

*FACEBOOK INFORMATION*

29. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

30. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

31. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

32. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

33. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

34. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a

9

user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

35. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

36. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

37. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

38. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

39. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

40. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

41. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

42. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

44. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

11

45. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

46. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

47. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

12

48. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g.,

13

information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

50. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

51. Based on the forgoing, I request that the Court issue the proposed search warrant.

52. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the Eastern District of Wisconsin is a district court of the United States that has jurisdiction over the offense(s) being investigated, 18 U.S.C. § 2711(3)(A)(i).] Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the Facebook user ID "Vaun L Mayes (Mr Milwaukee Worldstar) - ID # 504112393" that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

I. **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

    a.    All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    b.    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

    c.    All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

    d.    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f. All "check ins" and other location information;

g. All IP logs, including all records of the IP addresses that logged into the account;

h. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i. All information about the Facebook pages that the account is or was a "fan" of;

j. All past and present lists of friends created by the account;

k. All records of Facebook searches performed by the account;

l. All information about the user's access and use of Facebook Marketplace;

m. The types of service utilized by the user;

n. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

p. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18 U.S.C. 844(i) (arson of property in interstate commerce), 18 U.S.C 924(c) (use of a Molotov Cocktail to commit a federal arson crime), and 26 U.S.C. 5861(d), (e) & (f), (possess, transfer or making a firearm not registered in the National Firearms Registration and Transfer Record) since August 12, 2016 for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between Mayes and others related to the relevant offense conduct of commercial arson, possessing or making Molotov cocktails, and possessing Molotov cocktails while committing a crime of violence.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of commercial arson, possessing or making Molotov cocktails, and possessing Molotov cocktails while committing a crime of violence, including records that help reveal their whereabouts.

3